And if you'll go ahead and proceed, it's 17-5079 Grice v. CVR Energy, Mr. Robbins for the appellant. If you can give me 30 seconds to get this guy going. I can double check you on your briefs with this guy. You may proceed. Thank you, Your Honor. May it please the Court, my name is Michael Robbins and I'm here for the Grices, Benjamin Grice and his wife, Kayla. This is a case that was brought by the Grices to recover the injuries for Benjamin Grice, who was severely injured in a terrible explosion and fired at the Coffeyville Refinery back in July 2014. The fire and explosion was a direct result of the failure of the P-2217 pump that was ill-equipped. There was a poor shaft and it was in bad shape and there was a single seal, whereas the API and actually Coffeyville had approved double seals. Can you comment just initially on your position on the indispensable party issue? In particular, can you identify any potential prejudice to your clients if we held on to the appeal? The Grinberg issue about subject matter jurisdiction? Well, let me just state that I believe that Grices have sued CVI, I'll call them CVR Energy for this case, and they've also sued the Master Limited Partnership, which is an indirect subsidiary of CVI. Does it matter to this case if we dismiss the refinery? Well, they have been pointed to as the party, the necessary party throughout the litigation. As the primary provider of the services, we were taking the opposite position. That is true. There is a provision in the contract providing for indemnity for any liability. We believe that applies in this case. To that extent, they are, I believe, a proper party and I believe they're a necessary party. I would be happy to brief the issue. We asked to do that. I did not hear back from the court when we did ask. Okay. If CVR refinery were dismissed, what prejudice, if any, would your client cover? Off the top of my head, Your Honor, I believe the only injury would be that perhaps the liable party through the contract would be out of the case. Well, if you prevail, you would still get any damages from CVI Energy, would you not? CVR Energy has sufficient assets to pay a judgment. That's correct. And if we found they were a necessary party, then what do you do? Go back to state court? We would have to do that, yes, Your Honor. Is that what you want to do? We can. There are saving statutes that allow us to do that. All right. One thing, though, Your Honor, I would ask the court not to do is enter any kind of advisory opinion should the court decide to dismiss one of the parties because I think that would be inappropriate. What do you mean advisory opinion? Grinberg, we are permitted to dismiss the CVR Energy, correct? And proceed to the merits? Dismiss CVR Refining LP, the Master Limited Partnership? Master Limited Partnership, yes. I believe that's within the court's power. Okay. And you object to us exercising that discretion? Yes, Your Honor. What I was trying to bring up is the issue of CVR Energy has asked for an advisory opinion to go with it that they're not liable anyway. And I would ask the court not to do that. If the court is going to dismiss a party based upon it's not a necessary party, that's different than making a finding on the merits. All right. I think unless there are other questions on jurisdiction, go ahead and turn to your merits argument. Right. Well, let me jump to the points that I want to make on this case. This lawsuit is brought on the basis of negligence and gross negligence through the restatement seconded toward section 324A, which is an undertaking duty. The district court dismissed this case because the court found that there was no duty. We believe in the initial case and the initial opinion that he entered into, he found it was ambiguous. We believe that it's the farthest thing from ambiguity if you look at the contract. And the contract is important. It's insignificant in this case. The case law, and I'm going to rely on Kansas law because Kansas is not different in any material respect from Texas or Oklahoma. But under Kansas law, undertaking duty can be assumed through conduct, but it can be assumed through express undertaking. In fact, the courts have always looked with specific significance to an express undertaking to determine if that is the case. Many of the cases don't have a contract. We have the benefit of the contract. In this case, the contract, I believe, is determinative in whether a duty exists. Obviously, the issue of whether the duty was breached would have to be tried to a jury. In this case, the district court got caught up in advice regarding safety, ignoring completely the remaining obligations under the contract, which directly resulted, we believe, in the failure of the pump and the injuries to Mr. Bryce. The district court found that the services agreement was construed as a cost allocation deal between a parent and a subsidiary, and clearly the contract does spell out a number of administrative tasks that CVE Energy would perform. What is the flaw in the district court's interpretation that it's a cost allocation? Well, in the first case, it doesn't say it is. It says it's a services agreement. It says they would provide services necessary to operate the businesses conducted by the refining subs MLP, and it would include the management. It would include the management of the assets, including maintenance of those assets and other things. Even under Section 3 of the contract, which they look to with respect to calling it an allocation agreement, it's merely a discussion about how they can charge, by the way, by invoice, indirect and direct costs. In that regard, there is nothing that makes this, you cannot turn this services agreement into something that's a cost allocation. What's more, both the CFO of CDR Energy and the experts designated by the plaintiff stated and agreed that there's no gap requirement, nor is there an SEC requirement for there being a cost allocation agreement. I think that if you scan the entire contract, you cannot fairly say that this is not a services agreement. In fact, CDR Energy told the world in their 10K filings that that's exactly what it was. Was it Coffeyville personnel or was it CBI Energy personnel that undertook the safety obligations of the company? Well, does the record disclose that? I think Coffeyville is the local sub. Coffeyville Refinery is the particular refinery where the explosion occurred. The contract also applies to the other refineries, which are assets of the Master Limited Partnership. Who did the actual safety related work for Coffeyville? The actual safety, to the extent that we're talking about just safety, was the refining personnel. The management of that was delegated to CBR Energy pursuant to the contract. What's more, it anticipates that. The contract clearly states that the activities can be done by other persons, such as the refinery individuals, but that the liability for such work was retained specifically by CBR Energy. So it seems to me that high-level functioning doesn't get you where you need to be, that CBR Energy needed to be doing something closer to the safety work. What were they doing that gets you where you need to be under the case law? Were they not just giving advice and operating at a high level? They were not operating at a high level. They promised, well, they may not have operated. They may have only done that and were negligent in failing to do that. But it is important to say that this was day-to-day operations necessary for the business of the corporation, not looking over their accounts, not the typical parental conduct. And that, of course, is the key. Was this typical parental conduct, even though they're not a direct parent? Is it typical? And for at least five reasons, they're not. And the third reason is that they're taking over the management of the day-to-day operations of a plant. That's not what a parent does. A parent will sit back and determine at a higher level whether things are getting done according to a plan. But the day-to-day operations are usually performed at the level of the refinery or the level right above the refinery in this case. So let's talk about, let's just use the seal as an example. CBR gives safety advice to the various refineries underneath it. It says when you're using these seals, you should use a double seal. CBR doesn't then undertake to put the double seal in, does it? That would be done at the refinery level. CBR undertook, CBR Energy undertook to make sure that was done. And it was done in accordance with industry standards. They did not. They failed. I was going to say, well, they didn't do it. That's right. They failed. And not only did they not do it, they knew they needed to do that. So where does it, where do we go to the record to find evidence that it was going to be CBR's job to make sure that was installed other than just providing the guideline to the refining arm? I think you have to, my time is slipping by, but you need to go to the contract itself. The fact that they claim that they did not do it is equally evidence that they didn't do it. But let me add one more thing. They did it in the nature of an independent contractor. They have assumed a status that a parent does not assume. They are not an independent contractor. As Your Honor, I'm sure knows, the refineries have typically limited their liabilities through the use of independent contractors. In this case, the parent has become the independent contractor. And they knew, in doing so, that they were assuming liability. That is why we have the indemnity provisions that you have. They retain the ability to be sued and have to pay for gross negligence or fraud. In this case, we claim they were grossly negligent, but it doesn't matter. If they're negligent, they have the right to be indemnified by the refinery. Is there any evidence that CBR received more than its actual cost in providing these services? What the evidence is, and let's be clear, the evidence is that this whole arrangement was to allow CBR Energy to obtain an income stream that it would not otherwise be able to get as a parent. The revenue and the expenses go up to a limited partnership. That was for the MLP purposes, so they'd have money to distribute. I'm talking about CBR Energy. They would not be entitled to that. They are a 66% or 70% owner of other companies that own the Master Limited Partnership. There's a public aspect of about a third. Those people will not get that income stream. But it's not just income. It's the ability to bring in costs that are associated. So it's tens of millions of dollars that they would not be allowed to do, which brings up an innate conflict of this hat argument. You cannot just assume that the executives who are acting in dual capacity are only acting for the refinery. There is an innate conflict because there's an economic benefit for the parent corporation in this case. And they are operating as an independent contractor. This is highly unusual. It's highly extrinsic, to use the words of the Best Foods case. One more point before I'm going to run out of time. You do not need, for purposes of assuming liability, undertaking liability under Kansas law, you do not need to supplant the undertaking. Kansas law is very clear, and I would refer the court to the Dines case. I would refer the court to the Spires case. Though, Chief Judge Timkovich, you may disabuse me of my notion, a fair reading indicates that you can participate in, as well as supplant. All of the cases in Kansas support that. They can assume, they did assume, the public policy supports the imposition of an undertaking duty in this case, and I'm out of time. We hope that the court will consider this case, reverse the district court, and remand it for trial. Thank you very much. Thank you, Mr. Robbins. Let's hear from Mr. Smithman. Thank you, Your Honor. I think, first, the facts of this case clearly show the responsibility for that pump was at the refinery level. This is an eight-foot pump, six feet of which are below grade, below foundation, that had seals there. It is inspected on a daily basis by the operators that were there at the time and actually ended up being hurt. It is, the safety functions for it are administrated by a safety department at the refinery with a safety manager and a series of employees working for the safety manager. It is repaired and engineered and improved by a maintenance, reliability, and engineering department that is organic to the refinery and at the refinery and has a number of people. In fact, all were doing those jobs at the time. Well, you assumed an obligation for the day-to-day, to manage the day-to-day operations of Coffeyville. We do. And day-to-day operations of Coffeyville, like these other six refineries, that contract refers not to just Coffeyville resources for refining and marketing, but five other... Why does that help advance your cause? We're talking about Coffeyville. Because CBR Energy is 30 executives, 20 executives and 50 people, ultimately, in Sugar Land, Texas. These six subsidiaries are across the Midwest, really. Why did you draft your contract to give them the obligation for day-to-day operations management? Because they do a lot of day-to-day support in accounting, in IT and computers, invoicing, human relations. They do safety. They have some safety function because they interact with regulatory compliance and look at that and work on those issues. But they don't do it on a granular basis. They are not down there. The best example... It's your contract that's muddled the case. It's not that hard to draft an agreement that preserves the parent subsidiary separation and this blurs the line. It is a contract that is poorly worded in one appendix of a nine-page document that has been used since its inception solely to allocate on a quarterly basis the monies that are being paid to executives at the CBR Energy level and allocate them among the six subsidiaries there. In fact, it's one of two contracts that are service agreements. Each one generated at the time a master limited partnership was created. The first one was for the fertilizer distribution that was undertaken five years before. This contract, if you look at the earlier one and this one, it mirrors it perfectly. And it is, in fact, an allocation contract to do just that. The best example to show what the parties thought of it and treated it is one of the signatories, testified, that's what it is, is an allocation. The financial vice president of both entities. More important... Why is it called a cost allocation agreement? Why don't you call it a cost allocation agreement? I don't know. So we wouldn't have this litigation? I don't know. I didn't draft it. It was actually drafted by Securities and Exchange Council in New York at the time the master limited partnerships were created. And it was done so to show how the accounting would be undertaken so that when the monies go back and forth between these different entities that are owned by different parties with different percentage interests that it would be fair and appropriate and reflect what the intent was as you went forward. Mr. Robbins suggests you're trying to have it both ways. You're drafting an agreement that will pass SEC muster to distribute funds to the master limited partnership which requires this type of deal. And then when there's a tragic accident then you try to avoid liability through this argument. The facts of the case are that no engineer or executive from CVR Energy at Sugar Land, Texas ever went into the ISOM unit in five years preceding the accident. Does it matter that they didn't even though if this contract says that they could or would? It does. It does because there's two things going on here. There's the contract issue that's going on. There's also the 324A restatement of torts liability. And that imposes a liability if one undertakes gratuitously or for consideration to undertake something and one does it in a negligent manner that harms somebody. But here it was not undertaken at all. And the case law on parent immunity when it is immune and when it has done enough that it should respond in damages takes 324A liability in states that work. In Kansas and in most places it requires that you usurp, supplant or assume the duty. You take it over altogether and when you take it over altogether you're responsible for that. But if you don't take it over altogether then the natural management that hundreds of cases that all emanate from best foods come forward with the natural things you're allowed to do under the love decision in Oklahoma and so on. Why isn't that a fact question? It is a fact question and that was thoroughly briefed at the time of summary judgment. And what we did is we asked what are the allegations of negligence that you are asserting against the CBR entities. Essentially they said lack of oversight, lack of control you didn't take care of this property. And they said we simply assume all the testimony of Mr. Frost, an engineer. And that Mr. Frost he said he predicted liability on lack of direction and lack of oversight. Which he said CBR has the responsibility as the owner and higher headquarters of CRRM it had that duty. Well it doesn't. The law does not impose that duty upon a parent corporation. It's a stockholder. The whole purpose for stockholders is that parent corporations and those with equity in corporations don't have primary responsibility. But this stockholder has a contract that says it's going to manage the service recipients day to day business and operations and manage the service recipients property and assets in the ordinary course of business. So it's not that CBR was passive, just a passive stockholder. They were I mean whether they were doing it or not they had a contract that gave them the ability to get in seems to me down on a lower level and get involved in these things. Not at that lower level. But yes they had overall supervision that any manager or any stockholder would do under the Love decision and other decisions. Well you're not telling us are you that it would have had to be somebody come in from CBR to change the seals out are you? I mean obviously it can go up the chain from there. The best example I can give you in this very context is that whether it was a single seal or a double seal was addressed on a process hazard management, PHM determination in which you get the ISOM unit people there. And 13 CRRM operators talk about all the things in the ISOM unit that need help or safety problems need to be improved. Those 13 identified this and said it could use double seals, it's going to be better. And that was reported to who? 13 CRRM managers at the refinery. So that's not company wide the other 5 refineries under the CBR umbrella don't have the same safety recommendation on the double seals? They have at the high level they have a program saying it is a good thing to have double seals and you should go forward with double seals. But no one at Sugar Land is determining who puts them in and when. What they are determining is they're doing hazard analyses PHAs that are being done across the spectrum of those subsidiaries and making sure they're done on time. Having reports from each of the refineries and so on saying have you done the 15 or 30 or 60 items that are in this PHA for 2010 on the ISOM unit. But did they do that? Yes. But it wasn't done? No, they didn't. It was not actually the PHA that after the 13 reported to the 3 the task of doing it in the ISOM unit as well as the refinery for the dual seals was given to a Steve Adell a CRRM engineer and that CRRM engineer was in the process of doing it. And our brief will show you that it was delayed as all these things go back and forth in refineries 3 or 4 times, but the fact is it was not scheduled to have been completed at the time this accident occurred. And it also what's equally important is that the specifics of this PHA were not even known to the executives at Sugar Land Texas. They didn't know they'd never looked at the 2010 PHA where the dual seals are talked about. They had not come into the plant. They had not talked about it. They were totally unaware of it because it was at a granular refinery level. Is that something they would have looked at? Or should I say should have looked at? No. I think they looked at it in the appropriate manner. They are not there to tell an operator how to do it and when to do it and what to do. It's sort of like the military. They operate at a certain level and the people that report to them tell them when the PHAs have been completed and if they've been completed. Others tell them if the PHAs are appropriate or not. But it does not go after that level. That's where they stop. They can't go to six different subsidiaries. Distribution companies. Pipelines. Distributing companies. Purchasing companies. And run those things at a granular level. Twenty people just can't do that. They agreed to become an independent contractor here. It says independent contractor. What that means is a way to describe a traditional relationship. You know that could be a better contracted service agreement without question. I'll be the first to say that. But I can tell you the purposes for that service agreement were not imposition of liability or to discuss when things were going to be done. They were done so that the allocation of all that 50 people in Sugar Land, Texas could be apportioned among the subsidiaries that they were assisting when they did IT, when they did human relations, when they did regulatory agencies and so on. I only have three minutes left. Could I talk for just a moment to the Federal Rule 21 issue? And that is essentially dismissal of coffee bill CBR refining. I would urge the court on its own to dismiss CBR refining. The Grunberg case was decided on November 2, 2015. It said in that decision that it was a matter of first impression. This case was filed January 16, 2016. Essentially, two months later. If an MLP was, as the Grunberg found, had a jurisdictional citizenship in each state in which it had a unit holder, that was new law right out of the chute. If you go through the briefs, the primary brief, the reply brief, any aspect of it, there has never been an allegation of any kind against CBR refining. Refining was the recipient of the services under the services agreement. It was not the obligor. It was the obligee. And dismissal of one defendant to promote justice in order to preserve the diversity of jurisdiction has been something that this court has done since at least 1988. One of the very best cases that would sort of show this is Varley v. Tampax, which is 855 FedSecond 696. There, Judge Kelly found a summary judgment in favor of Tampax. But there were two other non-diverse parties. A hospital, St. Mary's, and a doctor, also in Kansas. It was a confusing thing because the beneficiaries of an estate were from Kansas and that governed diversity, but in fact, in this case, the administratrix was from Kansas and that governed diversity. He dismissed the whole thing saying he didn't have jurisdiction. This court reversed him saying, in our view, this is a classic case for dropping a dispensable non-diverse parties in order to preserve federal jurisdiction and give effect to a ruling of a federal court on the merits of a defense raised by a diverse party. In other words, he was reversed because they found that to be a reversible error to not preserve jurisdictional determination. That was undertaken with regard to Tampax. And what happened to St. Mary's Hospital and the doctor? They were pursued in state court subsequent to that when they were dropped from the suit. And if you were to do that in this particular case, there would be no harm done. In fact, all that would occur would be that the Grises get a second bite at the apple as to one lone remaining defendant, CBR Refine. Before you sit down, Judge Grisel concluded that the services agreement was ambiguous as to what day-to-day operations mean. Do you agree with that, and if so, why? I agree with his first decision that more evidence needed to be taken, and I agree with his second decision that upon considering all of the evidence, it was clear what it meant. In other words, I think he was correct in both orders that he issued. At the beginning, before we had 25 or 30 depositions, 9 expert witnesses, thousands of documents, and so on. At the end of all that, we had an ability to present what all this meant. And he understood it, and he ruled on that, and I think very appropriately. His comments on page 5 or 6 saying first of all, he talks about advice. What does advice mean? What happens if you don't heed advice? Does advice mean you have control? It doesn't say control, it just says advice. So he has a colloquy in there discussing the issues he doesn't fully understand or that he is uncomfortable with, and how he comes to the conclusion that the services agreement was just that, an allocation mechanism. It was not an attempt to take over liability. Take over a liability at a granular level when there is no evidence whatsoever in all that was undertaken that they had ever that the Sugar Land people ever wanted to come in and take over responsibility at that level. Alright, Counselor, I think we understand your arguments. Your time has expired. Thank you. We appreciate both presentations. The case shall be submitted. Counselor, excuse. Thank you, Your Honor. Thank you.